UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
CONSTANCE Y. ELDRIDGE,

                            Plaintiff,

            -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                            Defendant.
------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

15 Civ. 3929 (NSR) (PED)

TO THE HONORABLE NELSON S. ROMÁN, United States District Judge:

## I. INTRODUCTION

Plaintiff Constance Y. Eldridge brings this action pursuant to 42 U.S.C. § 405(g)

challenging the decision of the Commissioner of Social Security (the "Commissioner") denying

her application for benefits on the ground that she was not disabled within the meaning of the

Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.* The matter is before me pursuant to

an Order of Reference entered August 11, 2015. (Dkt. 6.) Presently before this Court are the

parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure (Dkts. 12 (defendant's motion), 13 (defendant's memorandum of law in

support), 15 (plaintiff's motion), and 16 (plaintiff's memorandum of law in support)).  For the

reasons set forth below, I respectfully recommend that defendant's motion be **DENIED**, and that

plaintiff's motion be **GRANTED** to the extent that the case is **REMANDED** pursuant to 42

U.S.C. § 405(g), sentence four, for further administrative proceedings.

## II.  BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration (Dkt. 9), filed by defendant in conjunction with the Answer (Dkt. 8).

A.    Application History

Plaintiff was born on October 13, 1968.  (R. 161.)  She graduated from high school and was trained as a beautician.  (R. 175.)  She worked as a metal forming machine operator for the United States Department of Treasury from 1987 until April 2011, where her duties included pressing coins and lifting over 20 pounds of metal.  (R. 36-37, 164, 175.)  She also previously worked as a production worker for a computer distributer.  (R. 164, 175.)

In January 2012, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging that she had been disabled since April 13, 2011.  (R. 148-151.)  Her claim was administratively denied.  (R. 79-83.)  Plaintiff requested a hearing before an administrative law judge ("ALJ") on May 22, 2012.  (R. 86.)  Plaintiff initially appeared before ALJ Roberto Lebron on March 21, 2013, and the hearing was adjourned for Plaintiff to review the evidence of record and find counsel.  (R. 65-71.)  Plaintiff appeared at a second hearing on July 11, 2013 with counsel.  (R. 22-64.)  The ALJ issued an unfavorable decision dated January 2, 2014.  (R. 11-18.)  On March 25, 2015, the ALJ's decision became the Commissioner's final decision when the Appeals Council issued a notice denying review.  (R. 1-4.)  Plaintiff timely filed this action on May 20, 2015.  (Dkt. 1.)

B.    Treatment Before the Alleged Onset Date

In June 2010, Plaintiff complained to her primary care physician, Dr. Ivette Torres, of hypertension and dizziness.  (R. 562.)  Dr. Torres's physical examination of Plaintiff was unremarkable at that time.  (R. 563-64.)  Plaintiff returned the following month for hypertension

and hyperlipidemia treatment; her physical examination was again unremarkable, and revealed no motor or sensory deficit and normal gait. Plaintiff had additional unremarkable examinations by Dr. Torres in November 2010 and February 2011. (R. 559, 570.)

Plaintiff saw Dr. Ahmad Hadid for a cardiac consultation in March 2011, after reporting chest pain. (R. 303.) Plaintiff had average exercise tolerance and reported worsening dyspnea[1], chest tightness, and heaviness on exertion. (Id.) She had no radiation to her arm, diaphoresis, leg edema, or paroxysmal nocturnal dyspnea.[2] Her physical examination revealed no respiratory distress and her extremities were normal. (Id.) Her electrocardiogram revealed diffuse ST-T wave changes. (Id.) Dr. Hadid diagnosed Plaintiff with chest pain syndrome with multiple risk factors for coronary artery disease, hypertension, hyperlipidemia, and dyspnea on exertion that could be an angina equivalent. (R. 303-04.) Dr. Hadid opined that Plaintiff was at moderate risk for coronary artery disease and required Plaintiff to undergo an exercise nuclear stress test to exclude ischemia.[3] (R. 304.)

Plaintiff underwent the stress test on March 21, 2011. Plaintiff had a normal blood pressure response and no chest pain or arrhythmia during the stress procedure, but the stress test was terminated due to shortness of breath. (R. 364-65.) The myocardial perfusion imaging

---

[1] Dyspnea is shortness of breath. See MedicineNet, available at http://www.medicinenet.com/script/main/art.asp?articlekey=3145.

[2] Paroxysmal nocturnal dyspnea is a sensation of shortness of breath that awakens the patient, often after 1 or 2 hours of sleep. See National Center for Biotechnology Information, available at http://www.ncbi.nlm.nih.gov/books/NBK213/.

[3] Ischemia is inadequate blood supply to a local area due to blockage of blood vessels leading to that area. See MedicineNet, available at http://www.medicinenet.com/script/main/art.asp?articlekey=4052.

study[4] revealed moderately abnormal myocardial perfusion, showing no area of infarction and a small to moderate zone of anteroapical ischemia.  (R. 364.)  Plaintiff's stress EKG, hemodynamic response, left ventricle function, left ventricle ejection fraction, and diastolic and systolic volumes were normal.  (R. 363-64.)  Plaintiff's echocardiology lab tests revealed mild aortic valve thickening, no aortic insufficiency, no echocardiographic evidence for mitral annual calcification or calcification of the mitral valve, and trace mitral and tricuspid insufficiency.  (R. 360.)  At Plaintiff's follow up visit with Dr. Hadid on March 24, 2011, she was experiencing no chest pain or respiratory distress.  (R. 302.)  Dr. Hadid diagnosed Plaintiff with recurrent episode of chest pain, abnormal nuclear stress test, strong family history of coronary artery disease, hypertension, and hyperlipidemia.  (Id.)  He encouraged Plaintiff to continue taking aspirin and beta blockers.  (Id.)

C.   Treating Sources During the Relevant Period

        The administrative record contains various medical and other treatment records.  The following is a distillation of their relevant points.

    1.   Dr. Hadid and Dr. Monsen

        Plaintiff was admitted to St. Luke's Cornwall Hospital in Newburgh on April 13, 2011 for a cardiac catheterization, abnormal chest pain, and abnormal stress test.  (R. 266, 400, 471-86.)  Dr. Hadid noted that cardiac catheterization showed severe right coronary artery disease.  (R. 266[5], 400.)  Plaintiff had an angioplasty stent to the right coronary artery, which

_____

        [4] This is a non-invasive imaging test that shows how well blood flows through (perfuses) the heart muscle.  See The American Heart Association, available at http://www.heart.org/HEARTORG/Conditions/HeartAttack/SymptomsDiagnosisofHeartAttack/ Myocardial-Perfusion-Imaging-MPI-Test_UCM_446352_Article.jsp#.V2GIPuYrJE4.

        [5] Dr. Hadid is mistakenly listed as "Dr. Hadab" in this discharge summary.

was complicated with distal dissection that needed two stents.  When Plaintiff continued to experience chest pain, a third stent was placed between the two stents, which improved Plaintiff's chest pain and flow.  (R. 266, 400.)  An echocardiogram revealed normal chamber sizes, normal left heart size with inferior hypokinesis[6] and overall preserved systolic function[7], aortic sclerosis[8] without aortic regurgitation[9], mitral leaflet sclerosis[10] with trivial mitral regurgitation[11], trivial tricuspid regurgitation not quantifiable by continuous wave Doppler, and no pericardial effusion.[12]  (R. 358.)

Plaintiff had a second echocardiogram on April 20, 2011, which revealed mild atrial dilation, no aortic root dilatation, no evidence of left ventricular dilatation, mild left ventricular

---

[6] Hypokinesis is a decreased heart wall motion during each heartbeat.  See Texas Heart Institute, available at http://www.texasheart.org/HIC/Gloss/.

[7] Systolic function is the highest blood pressure measured in the arteries. It occurs when the heart contracts with each heartbeat. See MedlinePlus, available at https://www.nlm.nih.gov/medlineplus/ency/article/007490.htm.

[8] Aortic sclerosis is a calcification and thickening of a trileaflet aortic valve in the absence of obstruction of ventricular outflow.  See National Center for Biotechnology Information, available at http://www.ncbi.nlm.nih.gov/pubmed/15628107.

[9] Aortic regurgitation occurs when the heart's aortic valve does not close tightly.  See Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/aortic-valve-regurgitation/basics/definition/con-20022523.

[10] Mitral leaflet sclerosis is a narrowing of the mitral valve opening.  See HealthLine, available at http://www.healthline.com/health/mitral-stenosis#Overview1.

[11] Trivial mitral regurgitation occurs when a heart's mitral valve doesn't close tightly, allowing blood to flow backward in the heart.  See Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/home/ovc-20121849)

[12] Pericardial effusion occurs when too much fluid builds up around the heart.  See Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/pericardial-effusion/basics/definition/con-20034161.

hypertrophy, moderate hypkinesis of the proximal and middle thirds of the inferior wall, normal left ventricular ejection fraction, mild aortic valve and mitral anular calcification, no pericardial effusion, and three cusps of the aortic valve.  (R. 355.)  Dr. Hadid diagnosed coronary artery disease status post cardiac catheterization, severe two vessel disease, treated with multiple stents in the right coronary artery, and drug eluting stent.  (R. 301.)  The distal right coronary artery still had 80% lesion, small for stent, and 70-80% stenosis in the proximal left anterior descending artery.  (Id.)  Plaintiff had normal left ventricular systolic function, hypertension, and hyperlipidemia.  Dr. Hadid advised Plaintiff to undergo a left anterior descending artery stent in the following four to six weeks.  (Id.)  On May 2, 2011, Dr. Hadid noted that upon discharge, Plaintiff apparently had three days of persistent chest pain on and off, which worsened with exertion.  (R. 399.)

When she returned to Dr. Hadid on April 29, Plaintiff had an EKG which showed no acute changes.  (Id.)  Dr. Hadid elected to transfer Plaintiff to Westchester Medical Center to undergo coronary angiography with a backup of cardiac surgery, taking into consideration Plaintiff's significant coronary artery disease, possible need of further stenting, and the complicated course after her initial angioplasty.  (Id.)

On May 2, Plaintiff was admitted to Westchester Medical Center for chest pain.  (R. 279.)  She received successful interventional treatment of a coronary stent in her left anterior descending artery, after the discovery of a moderate lesion of approximately 70% severity.  (R. 283, 398.)  Dr. Craig Monsen noted that the catheterization revealed significant improvement in the angiographic appearance of the right coronary artery, and the disease that was evident distal to the stents appeared to be well healed with no obstructive disease noted.  (R. 398.)  Plaintiff's discharge diagnoses were unstable angina, cardiovascular disease, hypertension, and high

-6-

cholesterol, and her condition was stable.  (R. 279-80.)  Dr. Monsen noted that Plaintiff tolerated

the procedure well and had mild symptoms.  (R. 398.)

When Plaintiff returned to Dr. Hadid for a follow up visit on May 11, 2011, Plaintiff was

feeling better, had no angina, and had occasional palpitations.  (R. 297, 528.)  An exercise stress

test on May 18, 2011 was negative for myocardial ischemia and chest pain, and Plaintiff

complained of shortness of breath at the end of the test.  Plaintiff was unable to tolerate a

changed protocol due to elevated incline and fast pace.  (R. 339, 577.)  At a subsequent follow

up visit on May 24, 2011, Dr. Hadid noted that Plaintiff was not in respiratory distress and her

exercise tolerance had improved significantly, but she continued to be anxious and concerned

about a possible problem with her heart.  (R. 296.)  Plaintiff had no angina, uncontrolled

hypertension, hyperglycemia, and hyperlipidemia, and her blood pressure was initially 150/80

and 140/80 after ten minutes into the interview.  (Id.)  Dr. Hadid advised Plaintiff to return to

work on June 13, 2011 without restriction.  (Id.)

On June 21, 2011, Plaintiff had no chest pain and complained of lower back pain for

which Dr. Hadid wrote her a temporary parking permit.  (R. 295.)  Dr. Hadid noted that Plaintiff

had not resumed her Lisinopril[13], which he asked her to take in her previous visit, and that from a

cardiac standpoint, Plaintiff was advised to continue Effient[14] and monitor blood pressure

closely.

Plaintiff returned to Dr. Hadid on May 3, 2012 for coronary artery disease and chest pain.

---

[13]  Lisinopril is used to treat high blood pressure.  See Drugs.com, available at
https://www.drugs.com/lisinopril.html.

[14]  Effient is used to prevent blood clots.  See Drugs.com, available at
https://www.drugs.com/effient.html.

(R. 457.)  Plaintiff's physical examination was unchanged, and her EKG was mildly abnormal with ST changes in the anterior leads, which was similar to the EKG from the previous year. (Id.)  Dr. Hadid noted that Plaintiff was not working and on disability because of her back pain which prevented her from doing any heavy exertion.  (Id.)

On May 23, Plaintiff had no angina and her physical examination was normal.  (R. 456, 497, 526.)  Dr. Hadid diagnosed Plaintiff with coronary artery disease, an abnormal nuclear stress test, uncontrolled hypertension, family history of coronary artery disease, and endometriosis.[15]  (Id.)  He increased Plaintiff's dose of Lisinopril to 20 mg twice daily, prescribed regular exercise, and discussed the risk of Plaintiff taking birth control pills for her endometriosis.  (Id.)  Dr. Hadid diagnosed Plaintiff on June 26, after a follow up visit, with coronary artery disease status post RCA and LAD stent, uncontrolled hypertension, occasional angina and endometriosis.  R. 496.

On January 22, 2013, Plaintiff reported to Dr. Hadid that she experienced some epigastric and retrosternal discomfort and nausea on a flight from Nashville to New York, and felt better after being given oxygen.  (R. 494.)  Plaintiff refused to go to the hospital.  (Id.)  Plaintiff was asymptomatic at the visit and her EKG showed no acute changes. (Id.)

On June 24, 2013, Dr. Hadid completed a Residual Functional Capacity Questionnaire, noting that Plaintiff had known coronary disease, that she had occasional chest pain with a 3/10 severity, and that Plaintiff had moderate limitation.  (R. 499-503.)  Dr. Hadid opined that Plaintiff's impairments lasted or could be expected to last at least twelve months and that Plaintiff could walk with rest for 1-2 city blocks, continuously sit for 1 or 2 hours, and stand for

------

[15]  Endometriosis occurs when the type of tissue that lines the uterus grows elsewhere. See MedlinePlus, available at https://www.nlm.nig.gov/medlineplus/endometriosis.html.

45 minutes.  (R. 500.)  Dr. Hadid assessed that Plaintiff could sit for about 4 hours in an 8 hour

working day with normal breaks and stand/walk for about 2 hours.  (R. 501.)  He wrote that she

needed to include periods of walking around during an 8 hour working day, for about 10 minutes

every 90 minutes, to shift positions at will from sitting, standing, or walking, and have 15 minute

unscheduled breaks.  (R. 501.)  After prolonged sitting, Plaintiff would need to elevate her legs

30 degrees for 30% of the day if she had a sedentary job.  (R. 502.)  Plaintiff could lift and carry

10 pounds or less frequently in a competitive work situation, 20 pounds occasionally, and never

50 pounds.  (Id.)  Plaintiff did not have significant limitations in repetitive reaching, and her

impairments would be likely to produce good days and bad days.  (Id.)  She would be able to

bend and twist at the waist 10% of the time and her impairments would cause her to be absent

from work less than once a month.  (R. 503.)  Dr. Hadid wrote that high stress can give Plaintiff

angina.  (Id.)

    2.   <u>Dr. Andin</u>

Dr. Perla Andin of the U.S. Office of Personnel Management examined Plaintiff on June

7, 2011.  (R. 405.)  Dr. Andin concluded that, upon review of Plaintiff's medical records, she

was unable to work at full normal capacity and was unable to bend/lift and stand for prolonged

periods.  (Id.)  Plaintiff continued to experience chest pain despite interventions done for her

heart disease.  (Id.)  On October 5, 2011, Dr. Andin noted that Plaintiff would be unable to

perform the physical requirements of her position or work full duty.  (R. 407.)

    3.   <u>Dr. Torres</u>

At a follow up visit with Dr. Torres on June 20, 2011, Plaintiff complained of fatigue,

dizziness, lightheadedness, headache, leg swelling, and high blood pressure.  (R. 566.)  On

August 18, 2011, Plaintiff's general examination was normal.  (R. 555-57.)  On November 16,

2011, Plaintiff had another normal physical examination and appeared in no acute distress.  (R. 552-53.)

At Plaintiff's next follow up visit with Dr. Torres for hypertension, diabetes mellitus, hyperlipidemia, and coronary artery disease on January 16, 2012, Plaintiff denied leg or ankle swelling, fatigue, headache, lightheadedness, myalgia, weakness, chest pain, dyspnea on exertion, palpitations, shortness of breath, orthopnea, edema, or dizziness, and had no complaints about her diabetes or about adverse effects of her medication.  (R. 538.)

On May 2, 2012, Plaintiff complained of chest pain, discomfort, sharp severe pain under her left breast associated with difficulty breathing, which was resolved, as well as pins and needles in her light reg associated with a pinched nerve.  (R. 541.)  Dr. Torres assessed that Plaintiff's diabetes was adequately controlled and that she should continue the same therapy, that Plaintiff's chest pain and dyslipidemia[16] required assessment/ follow up, and that Plaintiff's hypertension was without adequate control off of medication.  (Id.)

On November 11, 2012 Plaintiff returned to Dr. Torres and had an unremarkable physical examination.  (R. 545-547.)  Plaintiff had no complaints and a normal physical examination again on April 16, 2013.  (R. 549-50.)

4.   Dr. Jindal

On January 30, 2012, Dr. Surinder P. Jindal evaluated Plaintiff for lumbosacral pain, stiffness, numbness, and certain points which triggered the pain in the right buttock, thigh, and leg.  (R. 423.)  Plaintiff reported that when she walked sometimes her legs gave out, and that her pain was a 10/10 in severity.  (Id.)  Plaintiff had normal strength in all muscle groups and

---

[16]  Dyslipidemia is high cholesterol.  See MedicineNet, available at http://www.medicinenet.com/script/main/art.asp?articlekey=33979.

decreased sensation in the right L5-S1 distribution, ambulated favoring the right side, and her straight leg raises were 60 degrees and 70 degrees on her right and left legs, respectively. (Id.) Dr. Jindal diagnosed Plaintiff with low back strain with lumbosacral radiculopathy[17] with recurrent muscle spasm and recommended that Plaintiff get an electrodiagnostic study to reassess, due to her pain and numbness, and that she treat with conservative pain management. (Id.) Dr. Jindal performed trigger point injections, which Plaintiff tolerated well, and increased her pain management medication. (Id.) Dr. Jindal restricted Plaintiff to light duty. (Id.)

Plaintiff saw Dr. Jindal on March 26, 2012 for cervical pain, stiffness, and trigger points. Plaintiff complained that the symptoms intermittently worsened, and that the pain radiated to her buttock, thigh, and leg. (R. 426.) Plaintiff was given local trigger point injections which gave Plaintiff relief in functional level and daily activities. (Id.) Plaintiff denied any history of chest pain or shortness of breath. She was taking less medication which improved her ambulation. Plaintiff's heart appeared normal upon physical examination, she had normal strength in all muscle groups and decreased sensation in the L5-S1 distribution, favoring ambulation on the right side, tenderness and spasm in the paraspinal lumbosacral muscles, and straight leg raising of 40 degrees on the right and 60 degrees on the left. (Id.) Dr. Jindal diagnosed lumbosacral pain and lumbosacral radiculopathy, and recommended conservative pain management. (Id.)

On November 19, Dr. Jindal completed a form indicating that Plaintiff was totally disabled from performing her previous occupation, but that Plaintiff was not totally disabled from working at any other occupation or employment. (R. 601-02.) Dr. Jindal indicated that, with breaks, Plaintiff could stand and walk for 1 hour and sit and drive for 2 hours. (R. 601.)

---

[17] Radiculopathy is caused by the compression of a nerve in the spine. See MedicineNet, available at http://www.medicinenet.com/radiculopathy/article.htm.

Dr. Jindal also noted that Plaintiff's work capacity included light work including frequent lifting or carrying objects up to 10 pounds and/or lifting 20 pounds occasionally. (Id.)

Plaintiff next saw Dr. Jindal in January 2013 for lumbosacral pain and stiffness, with symptoms that intermittently worsened. (R. 593.) Plaintiff's strength was normal in all muscle groups, she had decreased sensation in right L5-S1 distribution, she ambulated favoring the right side, she had tenderness and spasm of the paraspinal lumbosacral muscles, and her right and left leg raising were 40 and 60 degrees, respectively. (Id.) Dr. Jindal's clinical impression was low back pain with lumbosacral radiculopathy with recurrent muscle spasm. (Id.)

Plaintiff's subsequent visits to Dr. Jindal on February 20, 2013 and March 27, 2013 showed no change, and Dr. Jindal's impression was right lumbosacral radiculopathy with radicular and myofascial pain.[18] (R. 592, 590.)

At Plaintiff's May 9, 2013 visit to Dr. Jindal, Plaintiff complained of lumbosacral pain and stiffness again and said that she cannot sit or stand for a long period of time. (R. 588.)

Plaintiff complained of cervical pain, stiffness, pain, and a burning sensation in the lumbosacral region at her June 11, 2013 visit to Dr. Jindal. (R. 586.) She stated that her pain was 8/10 in severity and that her legs gave out when she walked. She ambulated favoring the right side, had decreased sensation in the right l5-S1 distribution, had tenderness and spasm in paraspinal lumbosacral muscles, 40 and 60 degree leg raises on the right and left legs, respectively, and her strength remained normal across all muscle groups. (Id.) Dr. Jindal diagnosed Plaintiff with right lumbosacral radiculopathy with radicular and myofascial pain and recurrent muscle spasm.

_____

[18] Myofascial pain occurs when pressure is applied to sensitive points (also known as trigger points) in one's muscles, which causes pain in a different area of the body. See Mayo Clinic, available at www.mayoclinic.org/dieases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195?p=1.

(Id.)

Plaintiff returned to Dr. Jindal on July 9, 2013 with complaints of lumbosacral pain and stiffness, with a severity ranging from 7 to 10/10. (R. 584.) Dr. Jindal noted that Plaintiff used a cane. (Id.) Again, Plaintiff exhibited normal muscle strength, decreased sensation in the right l5-S1 distribution, and ambulation favoring the right side, and Dr. Jindal diagnosed Plaintiff with lumbosacral radiculopathy, radicular myofascial pain and recurrent muscle spasm, and continued to treat Plaintiff with trigger point injections. (Id.)

5.     Dr. George

Dr. Hadid referred Plaintiff to Dr. Joseph George for a myocardial perfusion imaging study on May 11, 2012, which revealed mildly abnormal myocardial perfusion with a small zone of apical myocardial infarction and no ischemia. (R. 459-60.) A stress EKG, hemodynamic response, and Plaintiff's left ventricle function were normal. Dr. George noted that compared to March 2011, anterior ischemia was resolved. (R. 460.) An echocardiography revealed no dilation of the left atrium aortic root or ventricle, mild left ventricular hypertrophy, normal left ventricle ejection fraction, no aortic stenosis or insufficiency, mild mitral valve thickening, mild mitral insufficiency, trace tricuspid valve regurgitation, no echocardiographic or Doppler evidence of pulmonary hypertension, and no pericardial effusion. (R. 462.)

E.     Consultative Examinations and Reviewing Physician Evidence

1.     Dr. Mark Johnston

Dr. Mark Johnston completed an internal medicine examination of Plaintiff on April 11, 2012. (R. 429.) Plaintiff's chief complaint was sharp and stabbing pain, with a 5/10 intensity, radiating from her lower back to her right hip and leg, which increased with prolonged sitting, standing or walking. Plaintiff reported some degree of relief with monthly trigger point

-13-

injections and prescribed medication, though she tries to avoid the use of narcotics.  (Id.)

A routine physical examination revealed diabetes and an abnormal exercise tolerance test.  (Id.)  Plaintiff had dyspnea with slight exertion and intermittent nonspecific chest discomfort.  Plaintiff reported that she had no episodes of chest pressure for the past several months but that she experiences shortness of breath with light activity such as climbing a single flight of stairs or walking more than one block.  (Id.)  Plaintiff reported that she only was able to do occasional cooking and light cleaning, but that she did laundry on a monthly basis and bathed and dressed herself daily.  (R. 430.)  Plaintiff was in no acute distress, was able walk on heels and toes without difficulty, used no assistive devices, had a one-half squat and normal stance, and needed no help changing for the exam or getting on and off the exam table or rising from the chair.  (R. 430-31.)  Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (R. 431.)  Her lumbar spine showed forward flexion 0 to 60 degrees, lateral flexion 0 to 20 degrees bilaterally, and rotation 0 to 20 degrees bilaterally.  (Id.)  Her supine SLR was positive at 30 degrees on the right and negative on the left, and her seated SLR was negative bilaterally.  (Id.)  Plaintiff showed full range of motion of shoulders, elbows, forearms, writs, hips, knees, ankles, did not have evident subluxations, contractures, ankylosis or thickening, had stable and nontender joints, and had no redness, heat, swelling or effusion.  (Id.)  Dr. Johnston noted normal deep tendon reflexes, no sensory deficit, and full strength in upper and lower extremities.  Plaintiff's extremities and fine motor activity of hands were otherwise intact as well.  (R. 432.)  An x-ray of Plaintiff's lumbosacral spine was negative and her disc spaces were maintained.  (Id.)  Dr. Johnston's medical source statement reflected that Plaintiff had a moderate limitation of bending and lifting because of low back pain, and that she should avoid tasks requiring mild or greater degrees of exertion because of coronary artery

disease.  (Id.)

2.    Dr. Blaber

Dr. R. Blaber of the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations reviewed Plaintiff's record and noted that, since the stenting, Plaintiff was doing well, though she had chronic back dysfunction, diabetes, coronary artery disease, and restricted back motion.  (R. 435.)  Dr. Blaber advised that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, sitting for 6 hours, and standing or walking for 6 hours, though she was restricted from heights and dangerous machinery, and was limited to occasional bending and crouching.  (Id.)

F.    Plaintiff's Hearing Testimony

Plaintiff appeared with counsel for a hearing before Administrative Law Judge Roberto Lebron on July 11, 2013.  Plaintiff's counsel informed the Court that he did not think the Court had the latest records, and explained that, though Plaintiff stopped working after her onset date in April 2011, the federal government paid her salary until July of that year.  (R. 25-26.)

At the time of the hearing, Plaintiff lived in a house in Newburgh with her mother, sister, and nephew.  (R. 28-29.)  She was born on October 13, 1968 and never married or had children.  (R. 28.)  She graduated high school, became a licensed cosmetologist soon after graduation, and worked as a cosmetologist for one year.  (R. 29-30.)  She worked for the U.S. Mint at West Point for 14 years as a metal forming machine operator where she would lift over 20 pounds of metal between work stations to press coins until April 12, 2011, the day before she first had a cardiac stent placed at St. Luke's.  (R. 30, 36-37.)  Plaintiff had been hurt on the job on September 2008, but worked until she had a second accident on October 20, 2008.  She returned in February 2009 on light duty, which limited Plaintiff to no lifting, bending, pushing, or pulling, and to lifting

-15-

only five pounds. (R. 35-36, 54.) She testified that she had an additional stent placed for other

reasons at Westchester Medical on May 1, 2011, and she stopped working on June 13. Plaintiff

testified that her doctor told her that she could not return to work at that time, and that when she

went back to work, her employer directed her to see their doctor, who, in August or September,

told Plaintiff that she could no longer return to work. (R. 31.) Plaintiff testified that her

employer put her on retirement disability around December of 2012, after Plaintiff filled out

some forms and submitted notes from Drs. Torres, Jindal, and Hadid to her HR Administrator,

and that she received $1,581 monthly. (R. 32-33.)

       Plaintiff testified that she had a pinched nerve in her back in L4 and L5, that her "heart is

not the greatest," that she experienced shortness of breath and double heart beats, and that she

had type 2 diabetes and hypertension, which Dr. Torres considered to be not under control. (R.

37-38.) Plaintiff testified that, as a consequence of her conditions, she suffered physical pain

"every single day" in her back, right leg, foot, and chest, and that the pain made it hard for her to

sleep. (R. 38-39, 50.) She testified that when she walked, her legs gave out from the pain from

her back. (R. 53.) She went to physical therapy for her heart in 2000 and 2011. She received

injections in her back from Dr. Jindal once per month, EMG tests, EKG, medicine, and

occasional stress tests from Dr. Hadid, and primary care services from Dr. Torres, including

prescriptions for medication including multiple heart medicine, ibuprofin, hydrocodone, and

cholesterol pills. (R. 40-43.)

       Plaintiff testified that she could only walk for less than five minutes before requiring a

ten minute rest, that she was unable to stand for fifteen minutes before needing to sit down, and

that she was unable to sit for more than twenty minutes before needing to stand up. (R. 43-44,

48.) She stated that she was unable to bend all the way to the ground, squat, or lift more than

five pounds.  (R. 46-47.)  Plaintiff testified that she was able to lift a gallon of milk at the

grocery store and was able to carry her pocketbook.  (R. 47-48.)  She bathed without assistance

and, though Plaintiff testified that she could probably wash her own hair, her sister washed her

hair.  (R. 51.)  Plaintiff's mother cooked the majority of the time, though Plaintiff sometimes

cooked a meal for herself.  (Id.)  She was able to put laundry inside the washing machine and in

the dryer, and her nephew carried the laundry up and down the stairs for her.  (R. 51-52.)

Plaintiff used to go to church regularly three times per week and testified that, since her

disability started, she only attended church on Sundays because the repetitive sitting and

standing was uncomfortable for her.  (R. 52, 56-57.)

        Plaintiff drove from her home in Newburgh to Goshen on the day of the hearing,

approximately twenty minutes.  (R. 48-49.)  She testified that she stayed home the majority of

the time and when she drove, which is not more than twice a week, she either drove herself or

was driven by a friend.  (R. 49.)  When she traveled, she used a wheelchair.  (R. 56.)  Plaintiff

arrived at the hearing with a cane, which she testified she had been using since 2008 when Dr.

Jindal prescribed it to her.  (R. 44-45.)  The ALJ noted that neither Dr. Jindal nor [Social

Security Administration Doctor] Dr. Mark Johnston  mentioned the cane in their notes.  (R. 45-

46.)  At the end of the hearing, the ALJ noted that some exhibits, including a completed medical

source statement from Dr. Hadid, were missing from the record, and informed Plaintiff that he

would wait to receive further medical records before making a decision in the case.  (R. 57-63.)

## III.  LEGAL STANDARDS

A.    Standard of Review

        In reviewing a decision of the Commissioner, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.     Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1.     The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.     If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.     If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.     If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.     If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the

-19-

claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan. 22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. See id.; 20 C.F.R. § 404.1560(c)(2). At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.  THE ALJ'S DECISION

The ALJ applied the five-step sequential analysis described above and concluded that plaintiff was not disabled under the meaning of the SSA. (R. 13-29.) At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 13, 2011. (R. 13.) At step two, the ALJ concluded that plaintiff's coronary artery disease, lower back pain, diabetes mellitus, and hypertension constituted "severe impairments" within the meaning of the SSA. (Id.) At step three, the ALJ determined that plaintiff's impairments (individually or combined) did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-14.) The ALJ noted that, for example, there was no evidence that Plaintiff's spinal condition caused her the severe neurological or motor deficits required by the listing, there was no evidence that Plaintiff's heart condition resulted in the severe, recurrent ischemia required by the listing, and that there was no evidence that Plaintiff's diabetes caused the severe organ damage required by the listing. (R. 14.) Next, the ALJ determined that plaintiff had the residual functional capacity ("RFC") "to

-20-

perform light work as defined in 20 CFR 404.1567(b) except that [she] can never work around moving machinery and she can never work at unprotected heights." (R. 14-17.)

At step four, the ALJ determined that plaintiff "is unable to perform any past relevant work." (R. 17.) At step five, the ALJ determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part P, Appendix 2)," and thus "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there [were] jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a))." (Id.) The ALJ concluded that plaintiff had not been "disabled" under the SSA. (R. 18.)

## V.  ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the Commissioner's decision on three grounds: (1) the ALJ did not properly consider the opinion from the treating physicians; (2) substantial evidence does not support the ALJ's decision regarding the Plaintiff's RFC; and (3) the ALJ did not make proper credibility findings regarding Plaintiff. (Plaintiff's Memorandum of Law in Support of his Motion for Judgment on the Pleadings ("Pl. Mem.") at 11-14.)

Defendant maintains that the Commissioner's final decision finding that Plaintiff was not disabled from her alleged disability onset date through the date of the ALJ's decision was "supported by substantial evidence and without legal error," and should be affirmed. (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Mem.") at 1.)

A.     Treating Physician Rule

I will begin by addressing plaintiff's claim that "[t]he ALJ did not properly use the opinions of the treating physicians in coming to his conclusion that the claimant could perform light work." (Pl. Mem. at 11).  Plaintiff asserts that, "[i]f the ALJ had considered the Treating Physician Rule he would have given the opinions of Dr. Hadid and Dr. Jindal controlling weight." (Id.)  As explained below, the Court finds that the ALJ properly considered the Treating Physician Rule with regard to Dr. Hadid, but agrees with Plaintiff that the ALJ failed to apply the Treating Physician Rule to Dr. Jindal's RFC determination.

    1.    <u>Dr. Hadid</u>

Plaintiff argues that Dr. Hadid's opinion warrants controlling weight as it is consistent with the substantial evidence in the record, and "Dr. Hadid has followed the plaintiff for her cardiac condition for a significant period of time and would be in the best position to conclude as to how any exertion would impact the claimant's cardiac impairment." (Pl. Mem. at 11). Plaintiff argues that Dr. Hadid's opinion is consistent with the opinions of Dr. Andin and Dr. Johnston, the consultative examiner, who opined that Plaintiff needed to avoid tasks requiring mild or greater exertion because of her coronary artery disease, and that Plaintiff had moderate limitations for bending and lifting - an opinion which Plaintiff argues is inconsistent with the ALJ's conclusion that Plaintiff could work at the light exertional level.  (Pl. Mem. at 11-12).

Defendant argues that the ALJ properly afforded Dr. Hadid's opinion "only limited weight because Dr. Hadid had seen Plaintiff only twice over the course of one year, was inconsistent with his own treatment notes, and was not consistent with other relevant medical evidence." (Def. Mem. at 22).

In considering any medical opinions set forth in the administrative record, the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the

medical record and is not inconsistent with other substantial record evidence.  See Green-Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.

When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be assigned to the treating source's opinion based upon consideration of the following factors: (1) the length, nature and extent of treatment and the frequency of examination; (2) the relevant evidence presented by the treating source in support of his opinion; (3) whether the opinion is consistent with the record as a whole; (4) whether the treating source is a specialist in the area relating to his opinion; and (5) other factors which tend to support or contradict the opinion.  See Shaw, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6).  The ALJ need not recite each factor explicitly, provided the ALJ's decision reflects substantive application of the regulation.  See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").  However, an ALJ's failure to set forth "good reasons" for the weight accorded to a treating source opinion is a ground for remand.  Greek, 802 F. 3d at 375.

Here, the ALJ addressed Dr. Hadid's opinion as follows:

> On June 25, 2013, Dr. Hadid – despite only having seen the claimant twice in the past year – completed a form regarding the claimant's residual functional capacity.  He opined that the claimant would only be able to stand and/or walk for two hours in an eight-hours day, [and] sit for only four hours in an eight-hour day.  He went on to opine that the claimant can only lift up to ten pounds frequently and twenty pounds occasionally, and that she would need to elevate her legs for 30% of an eight-hour day.  The undersigned gives this opinion

-23-

limited weight for several reasons.  First, as noted above, Dr. Hadid, at the time he made this opinion, had not seen the claimant for five months and had only seen her twice in the preceding twelve months.  Second, this opinion is not consistent with this observation from the last time he had seen the claimant where she reported that she was feeling well.  Finally, the undersigned gives this opinion limited weight since it is not consistent with the majority of the medical evidence of record documenting the mild abnormalities consistently found on objective studies of the claimant.

R. 17 (internal citations to record omitted).

The ALJ conducted a thorough review of the medical evidence that he states fail to support Dr. Hadid's opinion, and he expounds upon these contradictory reports throughout his opinion.  The ALJ's above articulation demonstrates that he applied the substance of the treating physician rule and amounts to "good reason" for the weight the ALJ accorded Dr. Hadid's opinion.

### 2.   Dr. Jindal

Plaintiff argues that Dr. Jindal's opinion, as described on a functional capacity evaluation form dated November 19, 2012, that Plaintiff has a capacity for light work (defined as "frequent lifting or carrying objects 0-10 lbs. and/or capacity to lift 20 lbs. maximum occasionally"), can stand and walk with breaks for one hour per day, and sit and drive for two hours per day with breaks should have been given controlling with by the ALJ.  (Pl. Mem. at 11).  The ALJ failed to consider what weight to give Dr. Jindal's November 19 evaluation (R. 601) using the six factors listed in 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5).  (R. 11-18.)  In fact, the ALJ cited to Dr. Jindal's reported findings from other office visits as evidence supporting the ALJ's RFC determination and undermining Plaintiff's credibility,[19] but failed to address Dr.

---

[19]  The ALJ noted that "[a]fter [a January 30, 2012] examination Dr. Surinder [sic] continued to recommend conservative treatment and released [plaintiff] to do light duty work. This evidence further erodes the credibility of the claimant's allegations since it shows that her

Jindal's opinion on the November 19, 2012 functional capacity questionnaire entirely.

Defendant does not address this omission.  (See Def. Mem.)  The ALJ's failure to follow the

treating physician rule in this regard amounts to a failure to apply the proper legal standard and

is grounds for reversal.  See Pereira v. Astrue, 279 F.R.D. 201, 208 (E.D.N.Y. 2010).

     As the Second Circuit explained in Snell v. Apfel, 177 F.3d 128, 133-34 (1999),

>      The final question of disability is, as noted earlier, expressly reserved to
> the Commissioner. See 20 C.F.R. § 404.1527(e)(1).  Reserving the ultimate issue
> of disability to the Commissioner relieves the Social Security Administration of
> having to credit a doctor's finding of disability, but it does not exempt
> administrative decisionmakers from their obligation, under Schaal [v. Apfel, 134
> F.3d 496, 505 (2d Cir.1998) (holding that failure to provide "good reasons" for
> not crediting the opinion of a claimant's treating physician is a ground for
> remand)] and § 404.1527(d)(2), to explain why a treating physician's opinions are
> not being credited.  The requirement of reason-giving exists, in part, to let
> claimants understand the disposition of their cases, even—and perhaps
> especially—when those dispositions are unfavorable.  A claimant . . . who knows
> that her physician has deemed her disabled, might be especially bewildered when
> told by an administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied.  See Jerry L. Mashaw, Due Process in the
> Administrative State 175–76 (1985).

     As in Snell, the Court finds that Plaintiff here is "entitled to be told why the

Commissioner has decided—as under appropriate circumstances is his right—to disagree with"

Dr. Jindal's assessment that Plaintiff's RFC is limited according to Dr. Jindal's indication on the

---

pain is relieved with treatment.  Furthermore, it does not support her allegation that Dr. Jindal
prescribed her a cane; and it further shows that doctors believe she is able to do light duty work,
contrary to her allegations.  Indeed, on March 26, 2012, the claimant returned to Dr. Jindal
complaining of pain.  However, Dr. Jindal noted that after administering the claimant an
injection into her spine, she was able to function at a higher level and did not need to take as
much pain medication. . . . On July 9, 2013, Dr. Jindal specifically noted that, with regards to her
pain, 'conservative pain management gave relief in both functional and objective level.'  For the
first time, in all of Dr. Jindal's records, he noted that the claimant uses a cane but did not note
that he had prescribed the same.  This evidence further erodes the credibility of the claimant's
allegations since it shows that the conservative treatment the claimant receives generally controls
her symptoms."  (R. 15-16) (internal citations omitted).

November 19 form.  Because the ALJ failed to properly apply the treating physician rule as to

Dr. Jindal, the Court concludes that remand is appropriate.  As the Second Circuit has held:

"[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the

weight given to a treating physician's opinion and we will continue remanding when we

encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight

assigned to a treating physician's opinion."  Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir.2004);

Accordingly, upon remand, the ALJ must reconsider and clarify his reasons, if any, for

declining to give controlling weight to Dr. Jindal's November 19, 2012 opinion.

B.      The ALJ's Credibility Findings

Plaintiff contends that the ALJ failed to properly assess plaintiff's credibility.  (Pl. Mem.

at 13-14).  "Because the Court concludes that the ALJ erred in applying the treating physician

rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ

erred in assessing plaintiff's credibility."  Balodis v. Leavitt, 704 F. Supp. 2d 255, 268 (E.D.N.Y.

2010).  However, in the interest of providing additional guidance on remand, the Court observes

that the ALJ did not properly assess the Plaintiff's credibility.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports

of pain and other limitations into account, but is not required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the

claimant's testimony in light of the other evidence in the record."  Genier v. Astrue, 606 F.3d 46,

49 (2d Cir. 2010) (internal citations omitted).  In deciding how much weight to give to a

claimant's subjective complaints, the ALJ must follow a two-step process set forth in the Social

Security regulations:

At the first step, the ALJ must decide whether the claimant suffers from a

> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider the extent to which the
> claimant's symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence of record. Id. The ALJ must consider
> statements the claimant or others make about his impairment(s), his restrictions,
> his daily activities, his efforts to work, or any other relevant statements he makes
> to medical sources during the course of examination or treatment, or to the
> agency during interviews, on applications, in letters, and in testimony in its
> administrative proceedings. 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
> 404.1529(a); S.S.R. 96–7p.

Genier, 606 F.3d at 49 (internal quotation marks and brackets omitted). "[W]here the ALJ finds

that the medical evidence does not substantiate the claimant's allegations [of pain and other

limitations], the ALJ must assess the claimant's credibility by considering seven factors

enumerated in the Social Security regulations." Rivera v. Astrue, No. 10 CV 4324, 2012 WL

3614323, at *14 (E.D.N.Y. Aug. 21, 2012). These factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and
> intensity of the pain; (3) precipitating and aggravating factors; (4) the type,
> dosage, effectiveness, and side effects of any medications taken to alleviate the
> pain; (5) any treatment, other than medication, that the claimant has received; (6)
> any other measures that the claimant employs to relieve the pain; and (7) other
> factors concerning the claimant's functional limitations and restrictions as a result
> of the pain.

Meadors v. Astrue, 370 F.App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)

(3)(i)-(vii)).

"Under the substantial evidence standard, a credibility finding made by an ALJ is entitled

to deference by a reviewing court." Acevedo v. Astrue, No. 11 Civ. 8853, 2012 WL 4377323, at

*11 (S.D.N.Y. Sept. 4, 2012) (Report & Recommendation) (adopted by 2012 WL 4376296

(S.D.N.Y. Sept. 24, 2012)). Nevertheless, "[a]n ALJ who finds that a claimant is not credible

must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there

are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'" Rivera, 2012 WL 3614323, at *14 (quoting Taub v. Astrue, No. 10 Civ. 2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

Here, the ALJ applied the two-step process described above to assess plaintiff's subjective complaints of pain and associated functional limitations.  (R. 10-11.)  The ALJ found, "[a]fter careful consideration of the evidence," that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 12.)

To the extent that, on remand, the ALJ analyzes Dr. Jindal's November 19, 2012 evaluation form in accordance with the treating physician rule as directed by this Report and Recommendation, the ALJ should consider whether this consideration alters his assessment of Plaintiff's credibility in light of the evidence as a whole.

Furthermore, the ALJ failed to consider Plaintiff's work history in his credibility determination.  "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."  Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir.1983).  "Work history, however, is but one of many factors to be utilized by the ALJ in determining credibility."  Swartz v. Comm'r of Soc. Sec., No. 13 Civ. 5963 (LGS), 2015 WL 220983, at *10 (S.D.N.Y. Jan. 13, 2015) ("That [Plaintiff's] work history was not specifically mentioned in the ALJ's decision does not undermine the credibility assessment, *given the substantial evidence supporting the ALJ's determination*.") (citing Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir.2011) (emphasis added)).  In this case, Plaintiff worked for the U.S. Mint at West Point for fourteen years until her alleged onset date.  (R. 30, 37.)  During that time,

Plaintiff worked without any noted restriction for one year after a workplace accident in September 2008, and returned to light duty work four months after a second workplace accident in October 2008.  (R. 35-36, 54.)  Upon evaluating Plaintiff's credibility remand, the ALJ should consider whether Plaintiff's 14-year work history entitles her to substantial credibility.  See, e.g., Ryan v. Astrue, 5 F. Supp. 3d 493, 513 (S.D.N.Y. 2014) (directing the ALJ to address what weight to give to plaintiff's work history on remand, where the ALJ failed to consider plaintiff's fifteen-year work history in assessing credibility).

The ALJ's analysis of Plaintiff's credibility also misconstrues the evidence and reflects a failure to consider facts that are contrary to the ALJ's conclusion that Plaintiff is not credible. For example, the ALJ noted that "[o]n January 22, 2013, the claimant presented to Dr. Hadid after experiencing chest pain and nausea on a flight from Nashville to New York; which contradicts her allegations that she does not often leave her home."  (R. 15-16.)  The Second Circuit has stated on numerous occasions that "a claimant need not be an invalid to be found disabled."  Williams v. Bowen, 859 F.2d 255, 260 (2d Cir.1988)); see also Smith v. Califano, 637 F.2d 968 (3d Cir.1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity . . . . It is well established that sporadic or transitory activity does not disprove disability.").  The Court does not find that Plaintiff's single domestic flight, during which she required administration of oxygen, amounts to "rigor[ous] air travel [that] is inconsistent with Plaintiff's allegations that she could sit for only 15 to 20 minutes at a time, and that she stayed at home most of the time."  (Def. Mem. at 19).

Further, the ALJ mischaracterized plaintiff's assessments of her own abilities throughout his decision.  For example, the ALJ summarized that Plaintiff "alleges that, despite her

conditions, she is able to do some housework." (R. 14.)  However, Plaintiff explained that while she "put[s] the laundry inside the washing machine and . . . in the dryer," her "nephew takes [her] laundry up and down the stairs for [her]," and that her "mom cooks the majority of the time." (R. 51-52.)  The ALJ may not cite to Plaintiff's activities while "wholly ignor[ing] the qualifications that Plaintiff placed on [her] ability to engage in [those] activities." Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 351-52 (E.D.N.Y. 2010).

On remand, the ALJ should re-evalute his credibility determination to provide a valid basis for discrediting Plaintiff's subjective complaints, and avoid cherry-picking only the evidence which supports an unfavorable outcome for Plaintiff.

C.     The ALJ's RFC Determination

Plaintiff argues that substantial evidence does not support the ALJ's decision regarding the Plaintiff's RFC. (Pl. Mem. at 12-13).  Defendant states that "the evidence of record supports the ALJ's finding that the Plaintiff had the RFC for a range of light work in light of medical opinion evidence that she could perform light work, and a lack of objective medical findings contrary to this opinion." (Def. Mem. at 17-24).  As explained above, the ALJ's failure to provide analysis of Dr. Jindal's November 19, 2012 opinion and his improper assessment of Plaintiff's credibility undermines the ALJ's conclusion regarding Plaintiff's RFC.  Upon remand, the ALJ should reassess Plaintiff's RFC after properly considering these issues.

## VI.  CONCLUSION

For the reasons set forth below, I respectfully recommend that defendant's motion be **DENIED**, and that plaintiff's motion be **GRANTED** to the extent that the case is **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

Dated: June 29, 2016
      White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

### NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  <u>See also</u> Fed. R. Civ. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Nelson S. Román, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Román.

-31-